Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5646 | **DATE** | 8/29/2002 |
| **CASE TITLE** | Jyame Dominicak-Brutus vs. Urban Property Services Co., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  Defendants' motion for summary judgment [10-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 3 0 2002 | 33 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| RO | courtroom deputy's initials | U.S. DISTRICT COURT | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
AUG 3 0 2002

JAYME DOMINICAK-BRUTUS,     )
    )
         **Plaintiff,**     )     **No. 01 C 5646**
    )
         v.     )
    )     **Judge Ruben Castillo**
**URBAN PROPERTY SERVICES**     )
**COMPANY and THE SYNERGY, INC.,** ) 
    )
         **Defendants.**     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jayme Dominicak-Brutus ("Dominicak") filed this lawsuit against Defendants

Urban Property Services Company ("Urban") and The Synergy, Inc. ("Synergy") under Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging sex discrimination, retaliation

and sexual harassment. Currently before the Court is Defendants' motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set out herein, Defendants'

motion for summary judgment is granted with respect to the sexual harassment claim and denied

with respect to the sex discrimination and retaliation claims. (R. 10-1.)

### RELEVANT FACTS

On March 22, 2000, Synergy employed Dominicak as a Property Coordinator

to work at Urban, a Chicago-based company that manages commercial real estate properties.

Synergy, a Chicago-based company, provides human resource and payroll services to companies

including Urban. Jeffrey Tosello, an employee of Synergy and President and Chief Operating

Officer of Urban, interviewed Dominicak and approved her hiring as Property Coordinator.[1]

---

[1] Defendants maintain that Synergy was Dominicak's sole employer as defined by Title
VII whereas Plaintiff maintains that Synergy and Urban were Dominicak's joint employers.
(R. 12, Defs.' Facts ¶¶ 2, 9; R. 27, Pl.'s Facts ¶¶ 2, 9.) Synergy and Urban are joint employers if

Tosello had the sole authority – subject to Synergy's approval – to hire, assign, promote, discipline and fire employees.[2] Although Property Manager Scott Mosak and Director of Property Management Gary Wenzel occasionally assigned work to Dominicak, Tosello supervised Dominicak throughout her employment at Urban.

Tosello created the Property Coordinator job description and viewed the Property Coordinator as primarily a receptionist or dispatcher with administrative duties. (R. 12, Defs.' Facts ¶ 33.) Although Tosello testified that a Property Coordinator should spend about ninety percent of her time receiving tenant calls and dispatching prearranged services, (*Id.*, Ex. C, Tosello Dep. at 14), Dominicak maintains that she performed work not described in the Property Coordinator job description, such as soliciting bids from vendors on repair work for properties and following up on overdue tenant collections, (R. 27, Pl.'s Facts, Ex. 1, Dominicak Dep. at 15-17). Moreover, Dominicak alleges that as Urban's clientele grew, many emergencies arose that she handled independently. (*Id.* at 53-54.) Defendants maintain, however, that Dominicak did not resolve the issues herself, but went to Roxanne Gardner, Urban's Vice President, or Tosello for direction. (R. 12, Defs.' Facts ¶¶ 73-74; *Id.*, Ex. H, Gardner Aff. ¶ 4.)

---

Urban exerted significant control over Synergy's employees. *DiMucci Constr. Co. v. N.L.R.B.*, 24 F.3d 949, 952 (7th Cir. 1994). Defendants plead, however, that all persons working at Urban, including Tosello, are Synergy employees. (R. 12, Defs.' Facts ¶ 8.) On the other hand, Plaintiff comes forth with deposition testimony that Tosello and Gary Wenzel referred to Urban as their employer, and with documentation that Synergy viewed itself as the acting human resources department of Urban. (R. 27, Pl.'s Facts ¶ 8.) The relationship between the two companies strikes the Court as peculiar and perhaps arranged to avoid liability on the part of Urban. Because the parties provide no argument as to whether Urban and Synergy are joint employers, the Court will not rule on the issue at this time.

[2] Dominicak, however, emphasizes that Brian Egan, Senior Asset Manager at Urban, took part in the interview and hiring process on at least one occasion. (R. 27, Pl.'s Facts ¶ 11.)

Egan described Dominicak's work as "desk-top property management." (R. 27, Pl.'s Facts, Ex. 3, Egan Dep. at 21.) As Egan described it, a Property Manager might spend time on-site responding to problems whereas Dominicak did not go on-site but would inform an on-site Property Manager of the problems. (*Id.* at 21-23.) In essence, "[w]hat Jayme was doing was part of what a property manager does." (*Id.* at 23.)

Tosello evaluated Dominicak at her six-month performance review on August 10, 2000. Dominicak's ratings ranged from "satisfactory" to "exceeds expectations." Tosello observed that Dominicak was meeting the responsibilities of her position. In the comments section, Tosello noted that Dominicak "has shown an outstanding ability to communicate and facilitate activity in the division. She shows better than average common sense and judgement [sic]," but he also noted that she needed to focus more on completing the administrative aspects of her job. (R. 12, Defs.' Facts, Ex. B, Dominicak Dep., Ex. 8, Performance Review.) Dominicak received a $1,000 raise along with her performance review.

Beginning at her initial job interview with Tosello, Dominicak expressed interest in advancing within the company. She maintains that Tosello told her that there was room for advancement and that he specifically referred to the Property Manager position. (R. 27, Pl.'s Facts, Ex. 1, Dominicak Dep. at 162.) Tosello, however, denies that Dominicak ever indicated to him that she wanted to be a Property Manager. (R. 12, Defs.' Facts, Ex. C, Tosello Dep. at 19.) Rather, Tosello recalled several conversations with Dominicak where they talked about career advancement in general and where he counseled her to go to college or to get involved with lease administration. (*Id.* at 19-21.)

Egan, however, testified that Dominicak told him that she wanted to be promoted to Property Manager. (R. 27, Pl.'s Facts, Ex. 3, Egan Dep. at 19.) Egan also testified that Tosello himself told Egan that Dominicak had spoken to Tosello about moving to a Property Manager position. (*Id*. at 19-20.) Egan testified that Tosello essentially told him that Dominicak needed more experience and skills before she could be promoted to Property Manager. (*Id*. at 20.) In Egan's opinion, however, Dominicak possessed the skills to become a Property Manager and could have handled the position "with more seasoning." (*Id*. at 25, 51.)

Egan thinks that he discussed Dominicak's desire to be a Property Manager with Tosello at the same time that the two discussed "the safety issue." (*Id*. at 49.) At his deposition, when asked if he recalled Tosello remarking that he preferred men over women as Property Managers, Egan testified that: "I think it may have been discussed more having to do with the safety issue, given the graphic [sic] location of some of our properties. Jayme is a petite, young, white female. Some of our properties are in disadvantaged communities, primarily African-American. I think there may have been a concern -- that there may have been a concern for Jayme's safety." (*Id*. at 35.) Egan could not recall whether Tosello brought up this concern or whether it arose in the course of conversation. Egan further testified that: "In my experience, the property manager deals with a lot of tradesmen, blue collar type of guys. And I have seen tradesmen try to fool or oversell a female who may not be as technically or mechanically educated as a man may be. So in my experience I have seen that happen where contractors try to steam roll or fool female property managers." (*Id*. at 36.) Egan could not recall whether he expressed this "steam rolling" concern to Tosello or whether Tosello expressed it to him. (*Id*.)

Although Defendants allege that Synergy did not hire anyone other than Mosak to work as a Property Manager at Urban during Dominicak's tenure, Dominicak asserts that Greg Frye was transferred into a Property Manager position. (R. 12, Defs.' Facts ¶ 182; R. 27, Pl.'s Facts ¶ 182.) Tosello, however, asserts that Frye was essentially a runner for the gas stations serviced by Urban client Illinois Petroleum Company and that he was neither a Property Manager nor a Property Coordinator but some blend of each. (R. 12, Defs.' Facts, Ex. C, Tosello Dep. at 18.) On December 19, 2000, Tosello hired Ryan Worcester as a Property Manager. Worcester had an associate's degree in liberal arts, was a licensed real estate broker and had worked as a property manager of commercial, residential and retail properties for nearly 10 years. Defendants allege that Urban was not actively looking for a Property Manager. (*Id.* at ¶ 183.) Dominicak, however, maintains that starting at the end of October 2000, she noticed that Urban was receiving resumes via fax for a Property Manager position. (R. 27, Pl.'s Facts ¶ 183.) When Dominicak confronted Tosello about the open Property Manager position, he told her that she was not qualified for the position because she did not know how to do a build out and that she did not have the requisite degree. Dominicak maintains that she was as qualified or more qualified than Frye or Worcester because she was "on the front lines" fielding telephone calls and working directly with tenants. (*Id.*, Ex. 1, Dominicak Dep. at 177.) Furthermore, Egan testified that although Worcester's resume was stronger than Dominicak's, "off-paper" Dominicak "could do anything she wanted to do." (*Id.*, Ex. 3, Egan Dep. at 51.) Dominicak admits that she did not meet the educational requirements for a Property Manager position, but asserts that neither did she meet the educational requirements for the Property Coordinator position. (*Id.* at ¶ 198.)

On November 2, 2000, Wenzel and Egan were talking in the doorway of Tosello's office when Wenzel hit Dominicak on the buttocks several times with a roll of site plans as she tried to enter Tosello's office. Later that same afternoon, Dominicak spoke to Tosello about the incident.[3] When Dominicak explained that Wenzel had "spanked" her, Dominicak alleges that Tosello laughed at Dominicak, said "okay" and said that he would talk to Wenzel about the incident. (*Id.*, Ex. 1, Dominicak Dep. at 100.) Tosello contends that he indicated to Dominicak during this meeting that Wenzel's behavior was inappropriate. (R. 12, Defs.' Facts ¶ 93.)

After speaking with Dominicak, Tosello spoke with Wenzel. Wenzel admitted to swatting Dominicak on the buttocks with the plans but claimed it was unintentional. Tosello asked Wenzel whether he understood the "severity of the situation" if Dominicak felt threatened or "weird" about the situation. (*Id.*, Ex. C, Tosello Dep. at 36.) Tosello also told Wenzel that his actions were "stupid," which Wenzel admitted they were, and that it should not happen again. (*Id.*) After speaking with Wenzel, Tosello spoke with Robert Meza, Urban's in-house attorney, who suggested that Tosello meet with both Dominicak and Wenzel to resolve the matter.

At Meza's suggestion, Tosello conducted a meeting with both Dominicak and Wenzel. Dominicak contends that when asked to explain himself, Wenzel laughed and stated that he was shocked Dominicak had reported his behavior. (R. 27, Pl.'s Facts, Ex. 1, Dominicak Dep. 105.)

---

[3] Dominicak was aware that Urban and Synergy had a sexual harassment policy. On June 21, 2000, Dominicak signed the Acknowledgment of Receipt of the "Employee Guidebook for Employees Working at Urban Investment Trust," acknowledging that she was responsible for reading the Guidebook and complying with the policies, procedures and standards of conduct contained therein. Prior to signing the Acknowledgment, Dominicak skimmed the Guidebook and later, around July 2000, read it completely. The Guidebook contains Urban's sexual harassment policy, including the requirement that all violations of the policies, procedures and standards be reported to the General Counsel or Chief Operating Officer.

Dominicak further maintains that she expressed how inappropriate the incident was, but stopped speaking during the meeting because Tosello and Wenzel began giggling. (*Id.*) Tosello recounts the meeting differently and thought the incident was resolved amicably. (R. 12, Defs.' Facts, Ex. C, Tosello Dep. at 32.) He alleges that he repeated both accounts of the incident and asked Dominicak and Wenzel if they could work together professionally, which Tosello says they both agreed they could do. (*Id.* at 37.) Tosello and Wenzel assert that Wenzel apologized to Dominicak, although she alleges that Wenzel never told her that he was sorry that she felt embarrassed. (*Id.*; R. 12, Defs.' Facts, Ex. E, Wenzel Dep at 35-36; R. 27, Pl.'s Facts, Ex.1, Dominicak Dep. at 109.)

After the meeting with Dominicak and Wenzel, Tosello wrote a memo to Meza summarizing the conversations of that day, sent a copy to Synergy and put a copy of the memo in Wenzel's personnel file. (R. 12, Defs.' Facts ¶ 106.) Tosello further testified that after he documented the incident in the memo, he called Gardner to tell her about the incident and his handling of it. According to Gardner, Tosello told her that he was writing up a chronology of events and sending it to Meza. (*Id.* at ¶ 107.)

In the aftermath of the incident, Dominicak continued to speak with Egan about it and to answer the questions that other employees asked about it. She continued to talk about the incident because she felt that "nothing was being done." (R. 27, Pl.'s Facts, Ex. 1, Dominicak Dep. at 110.) Dominicak admits that the swatting did not happen again, but that she felt her work environment was "terrible." (*Id.* at 111.) Dominicak also alleges that after the incident, Wenzel "hung around" her desk often and would stand "real close" behind her. (*Id.* at 145.)

Dominicak maintains that she reported Wenzel's alleged harassment to Gardner in a meeting, the details of which are disputed. Defendants assert that Gardner called Dominicak to a meeting after talking with Meza and Tosello, and that Dominicak only complained of the swatting incident and how she couldn't get over it. (R. 12, Defs.' Facts ¶ 113.) Dominicak maintains, however, that Gardner called her and Tosello to a meeting to discuss the IPC gas stations, and that Dominicak initiated conversation about Wenzel. (R. 27, Pl.'s Facts ¶ 113.) Dominicak alleges that she told Gardner and Tosello that she felt uncomfortable working around Wenzel and that she did not want to work with him anymore. (*Id.* at ¶ 114.) Dominicak alleges that she told Gardner and Tosello about additional instances of alleged sexual harassment, mainly that on a daily basis Wenzel would lean up against Dominicak's desk and tuck the sides of his trousers into each side of his penis so that it was discernible. (*Id.* at ¶ 113.) After the conversation with Tosello and Gardner, Dominicak admits that Wenzel did not touch himself inappropriately. (*Id.* at ¶ 128.) During the meeting, Tosello and Gardner advised Dominicak to make a formal complaint to Synergy. (*Id.*, Ex. 1, Dominicak Dep. at 126.)

On November 14, 2000, Dominicak called Monica Contreras, Synergy's Human Resources Manager, and reported Wenzel's harassment and Tosello's allegedly negative treatment.[4] Specifically, Dominicak reported the swatting incident – which she believed was not taken seriously – along with the allegations that Wenzel frequently "adjusted himself" in front of her in an indiscreet manner. (R. 12, Defs.' Facts ¶¶ 134, 138.) Dominicak asserts that Contreras

---

[4] Dominicak maintains that Tosello spoke to her in a negative manner. Dominicak spoke to Tim Rourke at Synergy about Tosello's treatment in an "off the record" conversation, where she did not name Tosello. Rourke advised Dominicak to go on the record with him or to report the behavior to Gardner. At that time, Dominicak did not pursue either option because she was "weighing [her] options." (R. 27, Pl.'s Facts, Ex. 1, Dominicak Dep. at 77.)

commented that "guys just sometimes do that" in response to Dominicak's report of the pants tucking, described the swatting as "playful," and advised Dominicak not to "open that can of worms" regarding her concerns over Tosello's treatment. (R. 27, Pl.'s Facts ¶ 141.) Contreras, on the other hand, maintains that she made no comment on what Dominicak reported and did not trivialize her complaints. (R. 12, Defs.' Facts ¶ 141.) When Contreras asked Dominicak what she thought a perfect resolution would be, Dominicak responded that making Wenzel stop and not reporting to him would resolve the issues.

During the November 14 conversation, Contreras told Dominicak that Tosello and Wenzel were out of town and that she would not be able to investigate until they returned on November 17. Dominicak maintains, however, that on November 17, Contreras informed her that she finished the investigation unexpectedly early because she was able to communicate with Wenzel and Tosello via cell phone. (R. 27, Pl.'s Facts ¶ 142.) At her deposition, Dominicak testified that: "I *believe* she stated that the investigation was completed." (*Id.*, Dominicak Dep. at 143 (emphasis added).) Dominicak asserts that when she asked Contreras what the outcome was, Contreras was "very vague with results" and responded that Wenzel was given a written reprimand in his file. (*Id.*, Ex.1, Dominicak Dep. at 143.) Dominicak was disappointed at this outcome. (*Id.*) Contreras, however, alleges that she last spoke with Dominicak on November 15 when she told Dominicak that after the investigation was completed, Urban would determine what kind of action would be taken against Wenzel. (R. 12, Defs.' Facts ¶ 148.) Contreras maintains that she had not even begun much less completed her investigation on or before November 17. (*Id.* at ¶ 152.)

On November 17, Contreras sent Tosello a memo regarding "Alleged Sexual Harassment Claim Against Gary Wenzel," the substance of which Dominicak testified was fairly accurate. Both Tosello and Gardner maintain that this was the first they heard about any other allegations against Wenzel, whereas Dominicak asserts that she reported the "pants tucking" to both during an earlier meeting. (*Id.* at ¶ 156; R. 27, Pl.'s Facts ¶ 156.) That same day, Dominicak submitted her resignation letter. Dominicak listed numerous reasons for her resignation, including "sexual harassment." (R. Pl.'s Facts, Ex. 26, Resignation letter.) On November 20, 2000, Tosello received the resignation letter and processed it like any other human resource matter – with a copy to Synergy and a copy to the file. Around that date, Tosello called Contreras to inform her that Dominicak had resigned. Barry Newman, Synergy's Director of Human Resources, then directed Contreras to discontinue the investigation. (R. 12, Defs.' Facts ¶ 166.) After seeing Dominicak's resignation letter, Gardner also suggested that the investigation be closed because she felt the reprimand of Wenzel for the swatting incident had been appropriate and had remedied the situation. Synergy processed Dominicak's resignation on November 22, 2000.

On or about February 22, 2002, Dominicak filed a Charge of Discrimination against Urban and Synergy with the Illinois Department of Human Rights. Subsequently, Dominicak requested a right-to-sue letter from the Equal Employment Opportunity Commission which was issued on May 21, 2001. Dominicak timely filed this suit on July 23, 2001. Currently before the Court is Defendants' motion for summary judgment on Dominicak's claims of sex discrimination, retaliation and sexual harassment.

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Id.*

## ANALYSIS

### I. Sex Discrimination

Dominicak asserts that there is direct evidence – Egan's deposition testimony – that she was not promoted to Property Manager because she is a woman. Defendants argue that Egan's testimony is too vague to constitute direct evidence of discrimination. Instead, Defendants argue that the case should be analyzed under the indirect method of analysis and that Dominicak cannot prove that she was qualified for a Property Manager position, that she sought such a position or that any similarly situated male was treated more favorably.

To establish a direct case of discrimination, a plaintiff must present evidence which suggests that the person with the power to hire, fire, promote or demote the plaintiff was animated by an illegal employment criterion. *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th

11

Cir. 1997). The most obvious example of a direct case of discrimination, for example, would be a remark by a decisionmaker that, "I am not going to promote you because you are a woman." An admission, however, is not necessary to show direct evidence of discrimination. *Id.* at 972-73. It is sufficient if the statements "reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Id.* at 973. Any statements, however, must be more than stray remarks and must be related to the employment decision in question. *Id.* The statements must be contemporaneous with the adverse action or causally related to the applicable decision-making process. *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (citations and quotations omitted).

Speculation by a non-decisionmaker as to the thoughts of the decisionmaker does not qualify as direct evidence of discrimination. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir. 1997). In certain cases, however, non-decisionmakers may provide valuable information on the motivations behind an adverse employment decision. *Fortino v. Quasar Co.*, 950 F.2d 389, 396 (7th Cir. 1991). A non-decisionmaker's comments may also be relevant if the plaintiff can show that the comments tainted the decisionmaker's judgment. *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121-22 (7th Cir. 1998).

If a plaintiff can show that an illegal criterion such as sex was a motivating factor in the adverse employment action, the burden shifts to the employer to demonstrate that it would have made the same decision even if the illegal criterion had not been considered. *Venters*, 123 F.3d at 973 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)). Even if the employer succeeds in proving that it would have made the same decision absent the illegal consideration, the plaintiff may still obtain declaratory and injunctive relief and attorney's fees. 42 U.S.C. §

2000e-5(g)(2)(B). Therefore, "once the plaintiff has presented evidence reasonably suggesting that her . . . sex . . . played a motivating role in [the adverse employment action], summary judgment will rarely (if ever) be appropriate." *Venters*, 123 F.3d at 973 n.7.

As an initial matter, Defendants argue that Dominicak has not identified a Property Manager position to which she could have been promoted. Dominicak, however, compares herself to at least two Urban employees who she alleges were either promoted or hired as Property Managers – Greg Frye and Ryan Worcester. Scott Mosak was also hired as a Property Manager in May 2000. Frye was not promoted to Property Manager, but was a runner whose duties combined those of a Property Manager and Property Coordinator. Worcester, however, was hired as a Property Manager on December 19, 2000. Defendants argue that because Worcester was hired after Dominicak's resignation effective November 24, 2000, any reference to Worcester is irrelevant. Moreover, Defendants assert that when they hired Worcester, they were not actively looking for a Property Manager. This contention seems disingenuous given that beginning at the end of October 2000, Dominicak began to see resumes come in by fax for a Property Manager position.

Dominicak asserts that she expressed interest in the Property Manager position to Tosello at the time of her hire and afterwards and that she also expressed the interest to Egan. Egan confirms that Dominicak expressed interest to him in a Property Manager position. Moreover, sometime after Dominicak saw the faxed resumes for the Property Manager position in late October 2000, she confronted Tosello and he told her she was not qualified for the position because she did not know how to do a build out and because she did not have the requisite degree. Tosello did not deny that there was an open position. Viewing these facts in the light

13

most favorable to Dominicak, the Court concludes that from the time of her hire, Dominicak expressed interest in obtaining a Property Manager position, sought such a position and that there were at least two such Property Manager positions available during her tenure. *Cf. Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1116 (7th Cir. 2001) (affirming district court's conclusion that there was no denial of a promotion when the plaintiff never sought a promotion to the desired position and there were no such positions available).

Defendants further argue that Dominicak could not have been promoted to Property Manager because she was not qualified. This may or may not be true. Dominicak's job as a Property Coordinator mainly consisted of fielding tenant calls and dispatching the appropriate vendors to resolve problems. Egan testified that these duties are part of a Property Manager's job and that Dominicak was essentially performing "desktop property management." Dominicak asserts that her work "on the frontlines" made her as qualified as Worcester. Furthermore, Egan testified that "off-paper" Dominicak was as competitive as Worcester. On the other hand, Worcester had more years of experience than Dominicak in the property management field, as an actual Property Manager. At this juncture, however, the Court need not decide whether Dominicak was qualified for the position of Property Manager. Even if Defendants succeeded in proving that Dominicak was not qualified for a Property Manager position, Defendants could nevertheless be liable for declaratory and injunctive relief and attorney's fees if sex played a motivating role in their decision not to promote her to Property Manager. 42 U.S.C. § 2000e-5(g)(2)(B).

After a careful examination of the record, the Court concludes that Dominicak has presented evidence reasonably suggesting that sex played a decision in Tosello's decision not to

promote her to Property Manager. Admittedly, Dominicak has not come forth with direct testimony by Tosello that sex entered into his evaluation of Dominicak for a Property Manager position. Dominicak, however, has come forth with evidence of conversation between Tosello and Egan where the two discussed their concerns with employing women as Property Managers. Egan testified that because Dominicak is a "petite, young, white female, " he and Tosello would be concerned for Dominicak's safety if she were promoted to Property Manager. Furthermore, the two discussed the idea that female property managers might be steam rolled or fooled by contractors. Egan testified that he thought that the "safety issue" came up when they discussed considering Dominicak for Mosak's Property Manager position. The record does not indicate when the steam rolling concerns were made. Dominicak does not plead whether it was Egan or Tosello who voiced the concerns related to promoting Dominicak to a Property Manager position and to hiring women as Property Managers in general. Nevertheless, the Court finds these comments sufficiently related to the decision not to promote Dominicak. Dominicak was employed by Defendants for a relatively short time period – eight months – thus Tosello and Egan's comments were made during that same time period. *Cf. Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 611-12 (7th Cir. 2001) (allegedly discriminatory remark not direct evidence because made four years prior to termination and unrelated to decision-making process); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (comment not contemporaneous because made one year prior to adverse action and in setting unrelated to discussion of the plaintiff's work performance); *Conley*, 215 F.3d at 711 (remark not contemporaneous because made more than two years before adverse action). Moreover, Dominicak's sex was directly referred to in discussing the safety concerns related to promoting her to Property Manager. The fact that Egan,

15

rather than Tosello, might have expressed the concerns does not compel the Court to discount the discussion. Egan appears to have had some influence in the hiring process – he participated in it. If the comments were made by him, rather than Tosello, they could have tainted Tosello's decision. *See Hoffman*, 144 F.3d at 1121-22.

In short, Dominicak has raised a genuine issue of material fact as to the motivation behind Tosello's decision not to promote her to a Property Manager position. Dominicak may or may not – as Defendants argue – have been qualified for the position. Given Egan's testimony, however, the Court concludes that a reasonable jury could conclude that sex was a motivating factor in the decision not to promote Dominicak.

## II. Retaliation

Dominicak also asserts that she was denied a promotion to Property Manager after she complained to Urban about sexual harassment on November 1, 2000. Defendants again maintain that Dominicak did not suffer an adverse action and that she was not promoted because she was not qualified.

To establish a prima face case of retaliation, Dominicak must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998). If Dominicak establishes these elements, the burden shifts to Defendants to produce a legitimate nondiscriminatory reason for their action. *Id.* at 1038-39. Dominicak then must show that the proffered reason is pretextual. *Id.* at 1039.

The parties do not dispute that Dominicak meets the first element of her prima facie case. An informal complaint to a supervisor – such as the one Dominicak made to Tosello – may

constitute protected activity. *See, e.g., Damato v. Jack Phelan Chevrolet Geo, Inc.*, 927 F. Supp. 283, 288 (N.D. Ill. 1996). Defendants maintain, however, that Dominicak cannot establish the second element of her prima facie case because she did not suffer an adverse employment action. The Court, however, already concluded that Dominicak was denied a promotion. Viewing the facts in the light most favorable to Dominicak, we find that she repeatedly expressed interest in a Property Manager position to Tosello and Egan since the time of her hire and specifically approached Tosello about a position sometime after late October 2000, a position which was later filled by Worcester in December 2000. As such, Dominicak meets the second element of her prima facie case. Finally, Dominicak establishes the third element of her prima facie case – a causal link between the protected activity and the adverse action by showing the suspicious timing between her complaint regarding sexual harassment around November 2, 2000 and Tosello's refusal around that same time to consider her for a Property Manager position. *Parkins*, 163 F.3d at 1039 (noting that a causal link is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action).

Defendants argue that Dominicak was not promoted to Property Manager because she was not qualified. As noted above, Dominicak has raised a genuine issue of material fact as to whether she was qualified for the position of Property Manager. Furthermore, Egan's testimony regarding female Property Managers, as discussed above, casts doubt on whether the proffered reason for Dominicak's denial of promotion – her alleged lack of qualifications – was simply pretextual. As such, the Court opines that summary judgment on Dominicak's retaliation claim is inappropriate.

### III. Sexual Harassment

Finally, Dominicak claims that she was subject to a hostile work environment, created by the alleged sexually harassing behavior of her purported supervisor Wenzel. Defendants respond that the work environment was not objectively hostile and that Dominicak's complaints were addressed and remedied. Furthermore, they argue that Wenzel was not a supervisor and thus the negligence standard should apply, and that even if Wenzel can be considered a supervisor, they meet the elements of the *Ellerth/Faragher* affirmative defense. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

To establish a prima facie case of sexual harassment based on a hostile work environment, Dominicak must demonstrate that: "she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on the [the individual's] sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002) (citing *Parkins*, 163 F.3d at 1032). An analysis of the fourth element – the basis for employer liability – is key because if the harasser is a supervisor, the employer is strictly liable subject to the *Ellerth/Faragher* affirmative defense whereas if the harasser is a co-worker, the negligence standard applies. *Id.* at 355-56.

The Seventh Circuit adheres to a strict definition of who qualifies as a supervisor under Title VII. *See Bodine*, 276 F.3d at 355-56; *Parkins*, 163 F.3d at 1034. An individual is not a

18

supervisor unless he possesses the authority to directly affect the terms and conditions of a

person's employment. *Bodine*, 276 F.3d at 355. This authority primarily consists of the power to

"hire, fire, demote, transfer, or discipline an employee." *Id.* (citing Parkins, 163 F.3d at 1034).

In this case, Dominicak argues that Wenzel was her supervisor and that Defendants

should thus be held strictly liable for Wenzel's actions. As support for her argument, Dominicak

maintains that Wenzel occasionally assigned her work.[5] This fact, however, is not sufficient to

establish Wenzel's supervisory status. *Bodine*, 276 F.3d at 355 (holding that fact that harasser

had marginal discretion to direct victim's work operation was not sufficient to impute Title VII

vicarious liability to the employer). Furthermore, Dominicak has not come forth with any

additional facts suggesting that Wenzel had the authority to affect the terms or conditions of her

employment. As such, Defendants are not liable under the strict liability standard and any

discussion of the *Ellerth/Faragher* affirmative defense is unnecessary.

Because Dominicak cannot establish that she and Wenzel had a Title VII supervisory

relationship, Defendants are liable only if they were negligent either in discovering or remedying

the alleged harassment. *Id.* at 356 (citations omitted). The focus of our inquiry is whether

Defendants had a reasonable mechanism in place for detecting and correcting harassment. *Id.*

(citations omitted).

In this case, Defendants had a formal sexual harassment policy in place that provided a

mechanism for detecting harassment. Urban initially became aware of the alleged harassment

---

[5] Dominicak also maintains that Wenzel had supervisory status because Contreras' memo labels Wenzel as Dominicak's supervisor. This label, however, is not indicative of Wenzel's actual authority to affect the terms and conditions of Dominicak's employment and is thus irrelevant to the inquiry.

when Dominicak reported the "swatting" to Tosello. After Dominicak's initial report of the "swatting," Tosello discussed the incident with Wenzel alone and in a joint meeting with Dominicak and Wenzel. Tosello also informed in-house attorney Meza and Synergy of the incident, put a memo regarding the incident in Wenzel's personnel file and informed Gardner of the incident. Whatever the dynamic of the meeting, Tosello's actions remedied the known harassment and Wenzel did not make any physical contact with Dominicak again. (R. 27, Pl.'s Facts, Ex. 1, Dominick Dep. at 111.) According to Dominicak, at a later meeting Tosello and Gardner became aware of the "pants tucking." Once again, Dominicak admits that after the conversation with Tosello and Gardner, Wenzel did not touch himself inappropriately again. (R. 27, Pl.'s Facts ¶ 128.)

Dominicak appears to have desired a stronger response from management. An employer informed of harassment, however, does not need to take the actions that the victim would like him to take (*e.g.* suspension, termination). *Rushing v. United Airlines*, 919 F. Supp. 1101, 1108 (N.D. Ill. 1996) (citing *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993)). An employer's duty in a co-worker harassment situation is to stop the harassment of which it has knowledge, which Defendants here did.[6] Moreover, if Dominicak thought Urban's handling of the situation was at all inadequate, she did not wait for Synergy's response to the situation before

---

[6] Dominicak claims that after she complained about the harassment, Wenzel began hovering over her and invading her personal space. In her November 14 complaint to Contreras, however, Dominicak did not mention this alleged harassment. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) ("the law against sexual harassment is not self-enforcing"). Moreover, the Court concludes that this albeit immature behavior cannot be considered objectively hostile. *See, e.g., Lindblom v. Challenger Day Program, Ltd.*, 37 F. Supp. 2d 1109, 11 (N.D. Ill. 1999) (finding that the plaintiff's allegations that co-worker stood too close to her, stared at her and touched her knee and shoulder on several occasions did not create an objectively hostile work environment).

resigning.[7]  Even viewing the facts in Dominicak's favor, she only claims that she "believes" Contreras said that the investigation was completed before she resigned.  Therefore, we find that Defendants were not negligent in either discovering or remedying the harassment and thus cannot be held liable for Wenzel's actions.

## CONCLUSION

For the foregoing reasons, we grant Defendants' motion for summary judgment with respect to the sexual harassment claim, but deny Defendants' motion with respect to the sex discrimination and retaliation claims. (R. 10-1.)  The parties are once again requested to reevaluate their final settlement positions before this lawsuit proceeds to trial.

ENTERED:

Judge Rubén Castillo
United States District Court

Dated: August 29, 2002

---

[7] Dominicak claims that she was forced to resign because of the conditions at Urban. Although we sympathize with the discomfort Dominicak was forced to endure at Urban, her constructive discharge claim fails because the conditions were not so intolerable such that a reasonable person in Dominicak's position would be compelled to resign. *Gawley v. Ind. Univ.*, 276 F.3d 301, 315 (7th Cir. 2001).